Andrea M. Kimball, State Bar No. 196485
Michelle A. Herrera, State Bar No. 209842
LUCE, FORWARD, HAMILTON & SCRIPPS LLP
600 West Broadway, Suite 2600
San Diego, California 92101-3372
Telephone No.: 619.236.1414
Fax No.: 619.232.8311

Attorneys for Plaintiff MedImpact
Healthcare Systems, Inc.

UNITED STATES DISTRICT COURT

SOUTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| MEDIMPACT HEALTHCARE SYSTEMS, INC., a California corporation,<br><br>    Plaintiff,<br><br>v.<br><br>SXC HEALTH SOLUTIONS, INC., an Illinois corporation;<br>RICHARD SCOT GIAMBRUNO, an individual;<br>THOMAS N. TABBACK, an individual; and INDEPENDENCE HEALTH STRATEGIES, a Florida limited liability company,<br><br>    Defendants. | Case No. 08-CV-0590 BTM(CAB)<br><br>**FIRST AMENDED COMPLAINT FOR (1) MISAPPROPRIATION OF TRADE SECRETS; (2) INTENTIONAL INTERFERENCE WITH PROSPECTIVE ECONOMIC ADVANTAGE; (3) NEGLIGENT INTERFERENCE WITH PROSPECTIVE ECONOMIC ADVANTAGE; (4) UNFAIR COMPETITION – CAL. BUS. & PROF. CODE § 17200, *ET SEQ.*; AND (5) INJUNCTIVE RELIEF**<br><br>**DEMAND FOR JURY TRIAL** |

Plaintiff MedImpact Healthcare Systems, Inc. hereby sues Defendants SXC Health Solutions, Inc., Richard Scot Giambruno, Thomas N. Tabback, and Independence Health Strategies, LLC, and alleges as follows:

### THE PARTIES

1.     Plaintiff MedImpact Healthcare Systems, Inc. ("MedImpact") is, and at all relevant times herein was, a privately held California corporation with its principal place of business in the County of San Diego, State of California. MedImpact provides full service Pharmacy Benefits Management ("PBM") services to its clients. MedImpact is an industry leader in the PBM arena.

2. MedImpact is informed and believes, and based thereon alleges, that Defendant SXC Health Solutions, Inc. ("SXC") is a corporation organized under the laws of Illinois with its principal place of business in Lombard, Illinois. MedImpact is further informed and believes, and based thereon alleges, that SXC is in the business of providing PBM services to customers throughout the United States, including this judicial district. SXC is a direct competitor with MedImpact.

3. MedImpact is informed and believes, and based thereon alleges, that Defendant Richard Scot Giambruno ("Giambruno") is an individual residing in and a citizen of the state of Florida.

4. MedImpact is informed and believes, and based thereon alleges, that Defendant Thomas N. Tabback ("Tabback") is an individual residing in and a citizen of the state of Texas.

5. MedImpact is informed and believe, and based thereon alleges, that Defendant Independence Health Strategies, LLC is a limited liability company organized and existing under the laws of Florida with is principal place of business in Ponte Vedra Beach, Florida. MedImpact is further informed and believes, and based thereon alleges, that Giambruno and Tabback are the Managing members of Independence Health Strategies.

6. MedImpact is informed and believes, and on that basis alleges, that at all times mentioned herein, each and every Defendant was the agent, servant, employee, joint venturer, partner, subsidiary, and/or co-conspirator of each other Defendant, and that, in performing or failing to perform the acts herein alleged, each was acting individually as well as through and in the foregoing alleged capacity and within the course and scope of such agency, employment, joint venture, partnership, subsidiary and/or conspiracy, and each other Defendant ratified and affirmed the acts and omissions of the other Defendant. MedImpact is further informed and believe that each Defendant, in taking the actions alleged herein and/or ratifying the actions alleged herein, acted within the course and scope of such authority and, at the same time, for their own financial and individual advantage, as well as in the course and scope of such employment, agency and as an alter ego therein.

///

7. Whenever, in this Complaint, reference is made to any actions of SXC, such allegations shall mean that the directors, officers, employees or agent of said entity did perform or authorize the alleged acts or actively engaged in the management, direction and control of such entity and were acting within the course and scope of their employment. Whenever, in this Complaint, reference is made to any actions of Independence Health Strategies, such allegations shall mean that the directors, officers, employees or agent of said entity did perform or authorize the alleged acts or actively engaged in the management, direction and control of such entity and were acting within the course and scope of their employment.

## GENERAL ALLEGATIONS

8. Giambruno worked for MedImpact from August 7, 2006 until December 19, 2007. At the time of his voluntary resignation from the company in December 2007, he served as Business Development Director. Tabback was employed by MedImpact from September 12, 2005 to December 20, 2007. At the time of his voluntary resignation from the company, also in December 2007, he served as Regional Director. While working at MedImpact, and in the course and scope of their employment, Giambruno and Tabback were granted access to highly sensitive proprietary information, including information pertaining to MedImpact's customers and accounts, pricing structures, reports, processes, business methods, identities of key contacts within the industry, information regarding the unique needs and preferences of particular customers and prospective customers, and other information which is not obtainable from public sources. Said proprietary information resulted from years of hard work, information gathering and trial and error by MedImpact.

9. MedImpact maintains the secrecy of its proprietary information by executing confidentiality agreements with all employees, independent contractors, and all other parties provided with MedImpact's confidential information. In addition, MedImpact uses firewalls, private networks, and other technical mechanisms to ensure the security of MedImpact's confidential information. MedImpact maintains password protection on its company computers. MedImpact also requires badges and other security mechanisms to control access to MedImpact's facility so as to safeguard its confidential and proprietary information. MedImpact also instructs

and repeatedly reminds its employees that the above information should be protected from disclosure to competitors, such as SXC. As a privately held company, MedImpact has less mandatory disclosure obligations to, for instance, shareholders and regulators, allowing MedImpact greater control over its trade secret and competitive information.

10. MedImpact also employs a confidentiality reminder that "pops up" on company computers each time an employee logs on to the network. MedImpact's reminder screen states: "I acknowledge that this PC belongs to MedImpact and is to be used primarily for business purposes. While I may use the equipment for limited personal use it may be subject to monitoring. There is no expectation of privacy for use of this PC and its use is authorized only in accordance with the IT system use policy. I acknowledge that using this PC for inappropriate activities including sending pornographic or other inappropriate emails, surfing pornographic or inappropriate Internet sites is strictly prohibited."

11. At the commencement of and during their employment, and as part of MedImpact's efforts to protect its proprietary information, Giambruno and Tabback agreed to and did sign confidentiality agreements and acknowledgments, wherein they agreed to hold the company's proprietary information in confidence and to not disclose such information to third parties. During their tenure with MedImpact, both gentlemen acknowledged their obligation to protect the company's confidential and proprietary information and agreed to protect the same.

12. On December 7, 2007, Tabback tendered his voluntary resignation and advised he was leaving to pursue a "lifelong dream" of writing a novel, which is very different from the PBM industry. Two days later, on December 9, 2007, Giambruno tendered his voluntary resignation to MedImpact. Both gentlemen were reminded, in writing, of their obligations to maintain inviolate the trade secrets and confidential and proprietary information they learned by virtue of their employment with MedImpact. Both Giambruno and Tabback, however, refused to sign departing paperwork required of the company including a Continuing Obligations Memorandum summarizing the protocols incumbent upon departing MedImpact employees and a Termination Certification regarding the company's confidential and proprietary information. Giambruno flat out refused to participate in an exit interview that is standard procedure at MedImpact, with the

proffered reasons that he did not want to sign the paperwork required of him and that the exit interview conflicted with his "tee time."

13. Immediately preceding and at the time they resigned from the company, both Giambruno and Tabback were intimately involved in a proposal for PBM services to MedImpact customer Ceres Strategies. In fact, as of the final day of employment of both gentlemen MedImpact had by and large secured the Ceres Strategies account; contract execution formalities were all that remained to be done. Ceres Strategies was a potentially lucrative account for MedImpact. MedImpact invested a substantial amount of time and resources procuring the account and stood to receive significant benefit over the course of the relationship.

14. SXC is a direct competitor of MedImpact. SXC and MedImpact also have the identical or similar market segments and lines of business.

15. At or about the time of Giambruno's and Tabback's departure from MedImpact, Ceres Strategies indicated it would sign a Letter of Agreement with MedImpact in anticipation of a fully executed contract. However, shortly after Giambruno's and Tabback's departure, the company's negotiations with Ceres Strategies abruptly and inexplicably came to a standstill. Ceres Strategies has refused to sign a Letter of Agreement, and instead demanded yet another sales presentation which MedImpact provided in February 2008. Since that time, Ceres Strategies has refused and continues to refuse to engage in any sort of dialogue with MedImpact, and has ignored the company's efforts to finalize the contract. MedImpact is informed and believes, and based thereon alleges, that Giambruno and Tabback have diverted the Ceres Strategies account either to SXC, a direct competitor of MedImpact, or to the separate competing venture that Giambruno and Tabback created while still employed by MedImpact. MedImpact is informed and believes, and based thereon alleges, that in doing so Giambruno and Tabback have wrongfully used confidential and proprietary information belonging to MedImpact, including information related to key contacts at Ceres Strategies and particular customer preferences.

///

///

///

16. The loss of the Ceres Strategies account has cause significant damage and detriment to MedImpact. Over the course of the multi-year term of the proposed contract, MedImpact stood to gain over well over $1,000,000.00 in connection with the account. As a result of Defendants' wrongful conduct, that opportunity has now been lost.

17. Forensic examination of the computers used by Giambruno and Tabback while employed by MedImpact reveals that the two gentlemen hatched a scheme for a competing PBM and/or PBM consulting venture at least as early as November 2007. A power point presentation outlining the services for an entity known as "Independence Health Strategies, LLP," created on November 18, 2007, was located on the hard drive of Tabback's computer. It describes a business venture that offers the following "Pharmacy Management Solutions": claims adjudication; provider network contracting; pharmaceutical contracting; and clinical management services. These are the very same services that MedImpact provides as a PBM. It bears repeating that the power point presentation was created by Tabback on his MedImpact computer. Tabback thus used MedImpact time and resources for his own competing endeavors and gain, to the detriment of MedImpact. MedImpact is informed and believes, and based thereon alleges, that Tabback spent a considerable amount of time developing the competing venture while employed by MedImpact and using MedImpact resources. However, MedImpact is informed and believes, and based thereon alleges, that prior to leaving the company Tabback "scrubbed" his hard drive in an unsuccessful effort to conceal his wrongdoing.

18. MedImpact is informed and believes, and based thereon alleges, that the business platform for Independence Health Strategies is based upon confidential and proprietary information belonging to MedImpact that Giambruno and/or Tabback wrongfully misappropriated for their own use, including but not limited to information related to MedImpact's business plans, methods and processes, contract pricing and pricing structures.

19. On November 27, 2007, Giambruno and Tabback took the next step toward perfecting their competing venture by registering "Independence Health Strategies" as a limited liability company with the Florida Secretary of State. A true and correct copy of the Articles of Incorporation for Independence Health Strategies is attached hereto as Exhibit 1. Giambruno and

1   Tabback are identified as the Managing Members of Independence Health Strategies, and the
2   stated purpose of the business is "healthcare consulting," which directly contradicts Tabback's
3   representation at the time of his resignation that he left the company to pursue an unrelated
4   "lifelong dream."

5       20.    MedImpact's forensic examination further revealed a business plan for a competing
6   venture located on the hard drive of Tabback's computer. Although Tabback attempted to delete
7   the document prior to his departure from the company, MedImpact's forensic analysts were able to
8   retrieve the document from a hidden folder. The metadata indicates that the business plan was
9   created by Mike Meyer, SXC's Senior Vice-President of Sales and Marketing on December 5,
10  2007, just a few days before Giambruno and Tabback tendered their resignations.

11      21.    An e-mail exchange between Giambruno on December 3, 2007 preceding the
12  business plan referenced above is also revealing, with Giambruno declaring "Today is a going to
13  be a great day for Independence[.] So many metaphors can be taken from our name!" Shortly
14  thereafter, both Giambruno and Tabback tendered their resignations.

15      22.    In February 2008, MedImpact received a report that Giambruno and Tabback had
16  approached existing MedImpact client in Georgia with a solicitation for their new business.
17  MedImpact is informed and believes, and based thereon alleges, that Giambruno and Tabback
18  outlined a "new venture" they were starting that would consist of a consulting company that
19  directed business to SXC, as well as an independent PBM. Tabback was the account executive on
20  that account while employed at MedImpact. MedImpact is informed and believes, and based
21  thereon alleges, that Giambruno and Tabback's solicitation of MedImpact's customer was based
22  upon confidential and proprietary information belonging to MedImpact, including client contact
23  information, pricing structure and preferences.

24      23.    In March 2008, MedImpact received additional reports that Giambruno and
25  Tabback had solicited the business of two additional MedImpact customers, one in Missouri and
26  one in South Carolina, utilizing confidential and proprietary information belonging to MedImpact
27  including a territory spreadsheet Giambruno had access to while employed at MedImpact.
28  ///

24. MedImpact is informed and believes, and based thereon alleges, that the wrongful misappropriation of trade secrets, unfair competition and other wrongful acts by Giambruno, Tabback, Independence Health Strategies and SXC represent a mere tip of the iceberg, and that all Defendants have engaged in a pattern and practice of using MedImpact's confidential and proprietary information to unlawfully compete with MedImpact and to otherwise injure its status and reputation in the PBM industry.

25. MedImpact has demanded that Giambruno, Tabback and SXC cease and desist from using MedImpact's confidential and proprietary information and return the same to MedImpact, but Defendants have refused to do so.

## JURISDICTION AND VENUE

26. This Court has subject matter jurisdiction over this action pursuant to 28 U.S.C. § 1332, as there is complete diversity between the Plaintiff and all Defendants and the amount in controversy exceeds the sum of $75,000.00.

27. Venue is proper in this district under 28 U.S.C. § 1391, because a substantial part of the acts of trade secret misappropriation, unfair competition and interference with economic relationships complained of herein have occurred and are occurring in this judicial district.

## FIRST CAUSE OF ACTION

## MISAPPROPRIATION OF TRADE SECRETS

### (Against All Defendants)

28. MedImpact hereby incorporates by this reference Paragraph 1 through 27, inclusive, as if set forth fully herein.

29. At all times relevant herein, MedImpact was in possession of trade secrets in its confidential and proprietary information related to its customers and accounts, including unique customer preferences, contracts, pricing structures, reports, processes, presentations, business methods and plans, marketing and business plans, identities of key contacts within the industry, and other information which is not obtainable from public sources. This information has economic value in that it enables MedImpact to offer and provide Pharmacy Benefits Management

1  services customized to the unique needs and circumstances of each customer. Said information is
2  not generally known to the public or to the managed pharmacy benefits industry, and derives
3  independent economic value from not being known to the general public or to the relevant
4  industry.

5      30.    MedImpact has expended hundreds of thousands of dollars and a significant
6  amount of time and other resources in developing its proprietary information. In addition,
7  MedImpact goes to great lengths to protect the secrecy of this information by executing
8  confidentiality agreements with all employees, independent contractors, and all other parties
9  provided with MedImpact's confidential information, maintaining firewalls, private networks, and
10  other technical mechanisms to ensure the security of MedImpact's confidential information,
11  labeling certain written communications as confidential, employing passwords and "pop up"
12  screens reminding its employees of their confidentiality obligations and several other security
13  mechanisms to protect MedImpact's confidential information.

14      31.    MedImpact is informed and believes, and based thereon alleges, that in or about
15  November or December 2007, Giambruno and Tabback misappropriated MedImpact's
16  confidential and proprietary information and converted the same to their own use in their
17  competing venture, Independence Health Strategies, and diverted the same to SXC, a direct
18  competitor of MedImpact which solicited and established a consulting, employment or other form
19  of business relationship with Giambruno, Tabback and Independence Health Strategies, as set
20  forth herein.

21      32.    MedImpact is informed and believes, and based thereon alleges, that SXC knew or
22  should have known that the information provided by Giambruno and Tabback was taken from and
23  belonged to MedImpact. MedImpact is further informed and believes, and based thereon alleges,
24  that SXC willingly accepted information from Giambruno and Tabback that it did not otherwise
25  have, and solicited Giambruno and Tabback for information knowing that it came from
26  MedImpact. MedImpact is further informed and believes, and on that basis alleges, that SXC
27  performed no due diligence to ensure that Giambruno and Tabback did not share confidential
28  ///

MedImpact information with SXC and actually encouraged Giambruno and Tabback to misappropriate MedImpact information for the benefit of SXC.

33. As a proximate result of Defendants' acts as alleged herein, MedImpact has suffered damages, and will continue to suffer damages, unless Defendants are enjoined from using the confidential trade secret information they misappropriated and ordered to immediately return said information, and unless MedImpact obtains actual damages consisting of the loss of customers and revenues. While the exact amount of damages will be proven at trial, MedImpact is informed and believes, and based thereon alleges, that the value of the actual and potential customer contracts and associated revenues lost though Defendants' wrongful conduct exceeds $1,000,000.00. Alternatively, and at a minimum, MedImpact is entitled to a reasonable royalty for Defendants' wrongful misappropriation and use of MedImpact's trade secrets, in an amount to be proven at trial.

34. Defendants, in engaging in the aforementioned acts, are guilty of malice and oppression in that they deliberately intended to harm MedImpact's business and improve their own by misappropriation and acted in conscious disregard of MedImpact's rights. Defendants' conduct therefore warrants the assessment of punitive damages in an amount appropriate to punish Defendants and deter others from engaging in similar conduct.

35. Defendants wrongful conduct in misappropriating MedImpact's confidential customer and competitive business information and disclosing and utilizing said information will continue unless and until enjoined and restrained by order of this Court. Without such Court intervention, Defendants' conduct in misappropriating MedImpact's proprietary information will cause great and irreparable injury to MedImpact's business, in that MedImpact has lost and will continue to lose existing and potential clientele and customers.

36. MedImpact has no adequate remedy at law for the injuries currently being suffered in that Defendants will continue to wrongfully solicit MedImpact's existing and potential clientele and customers and utilize information that was wrongfully misappropriated from MedImpact, including but not limited to customer information that is not generally available to the public at

///

large. MedImpact is entitled to a temporary, preliminary and permanent injunction against Defendants as prayed herein.

37. MedImpact is informed and believes, and on that basis alleges, that Defendants' conduct was, and is, malicious, fraudulent, deliberate and willful. MedImpact is therefore entitled to recover from Defendants exemplary damages in the amount of twice the total damages or reasonable royalty awarded, pursuant to California Civil Code §3426.3.

38. MedImpact is also entitled to an award of attorneys' fees pursuant to California Civil Code § 3426.4.

## SECOND CAUSE OF ACTION

## INTENTIONAL INTERFERENCE WITH PROSPECTIVE ECONOMIC ADVANTAGE

### (Against All Defendants)

39. MedImpact hereby incorporates by this reference Paragraph 1 through 38, inclusive, as if set forth fully herein.

40. MedImpact is informed and believes, and based thereon alleges, that as a result of Defendants' conduct in misappropriating MedImpact's confidential customer and business information and using the same to solicit existing and potential MedImpact customers, which has had the effect and shall have the effect of interfering with MedImpact's economic relationships with existing and potential clientele, MedImpact has been damaged. While the exact amount of damages will be proven at trial, MedImpact is informed and believes, and based thereon alleges, that it has lost in excess of $1,000,000.00 in contractual benefits as a result of Defendants' wrongful conduct that MedImpact stood to gain through its relationship with Ceres Strategies and other actual and potential customers.

41. MedImpact is informed and believes, and based thereon alleges, that Defendants' wrongful acts will continue to cause injury to MedImpact and that such injury will continue unless enjoined and restrained by this Court.

42. MedImpact is informed and believes, and based thereon alleges, that the acts of Defendants alleged herein were willful, oppressive, fraudulent, despicable and in conscious disregard of the rights of MedImpact and the resulting harm to MedImpact. Defendants are liable

for punitive and exemplary damages in amount to be established according to proof at time of trial.

### THIRD CAUSE OF ACTION

### NEGLIGENT INTERFERENCE WITH PROSPECTIVE ECONOMIC ADVANTAGE

(Against All Defendants)

43. MedImpact hereby incorporates by this reference Paragraph 1 through 42, inclusive, as if set forth fully herein.

44. As set forth above, economic and ongoing business relationships existed and exist between MedImpact and its clientele and customers containing an existing and probable future economic benefit or advantage to MedImpact.

45. Defendants knew of the existence of the economic and business relationships between MedImpact and its clientele and customers by virtue of Giambruno's and Tabback's former employment with MedImpact. Defendants also knew of the existence of MedImpact's relationships by virtue of the documents drafted by SXC relating to Tabback and Giambruno's new venture and client and account information shared with SXC.

46. MedImpact is informed and believes, and based thereon alleges, that Defendants were negligent in that they knew or should have known that Giambruno and Tabback owed a duty to MedImpact to maintain the confidentiality and secrecy of MedImpact's proprietary customer and competitive business information, yet violated that duty resulting in the misappropriation of said information and the interference and disruption by Defendants with the actual and prospective economic and business relationships between MedImpact and its clientele and customers.

47. Because the economic relationships between MedImpact and its clientele and customers were interfered with and disrupted by Defendants, and as a proximate result of Defendants' acts as alleged herein, MedImpact has suffered damages and will continue to suffer damages consisting of the loss of customers and revenues in an amount to be proven at trial, unless Defendants are enjoined. While the exact amount of damages will be proven at trial, MedImpact is informed and believes, and based thereon alleges, that it has lost in excess of $1,000,000.00 in contractual benefits as a result of Defendants' wrongful conduct that MedImpact

stood to gain through its relationship with Ceres Strategies and other actual and potential customers.

## FOURTH CAUSE OF ACTION

## UNFAIR COMPETITION – CAL. BUS. & PROF. CODE § 17200, ET SEQ.

### (Against All Defendants)

48. MedImpact hereby incorporates by this reference Paragraph 1 through 47, inclusive, as if set forth fully herein.

49. The actions of Defendants described herein in misappropriating MedImpact's confidential customer and competitive business information, and other information and property that belonged to MedImpact, and unfairly and fraudulently soliciting existing and potential customers of MedImpact, constitutes unlawful, unfair and fraudulent business acts and practices, in violation of California Business & Professions Code §§ 17200, et seq. ("UCL"). Giambruno and Tabback further engaged in unfair and fraudulent business practices by undertaking efforts to establish a competing venture while still employed by MedImpact using both time and resources, including power point presentations and other MedImpact proprietary information such as business methods, plans and processes, target lists, etc., that should have been devoted to their duties and responsibilities as employees of MedImpact. Giambruno, Tabback and SXC further usurped relationships that MedImpact expended substantial time and resources cultivating with its customers and clients.

50. As a direct result of Defendants' acts of unfair competition under the UCL, MedImpact has suffered and will continue to suffer harm as described herein, and such harm will continue unless the Court enjoins and restrains Defendants' actions.

51. Defendants should be required to restore to MedImpact any and all of MedImpact's confidential, trade secret information and any other information of MedImpact in Defendants' possession, custody or control. MedImpact also seeks injunctive relief to stop SXC from unfairly soliciting MedImpact's current and potential customers. Further, MedImpact seeks injunctive relief for the return of its information wrongfully obtained through appropriate restitution and any other property wrongfully taken.

52. As a proximate and legal result of Defendants' wrongful conduct, MedImpact has been damaged in its business relationships with potential and existing clientele and customers, and has suffered harm in the form of lost sales, loss of reputation, loss of the ability to control access to its trade secrets and loss of goodwill. As detailed herein, MedImpact seeks an order granting MedImpact and the general public relief from Defendants' deceptive, unfair and fraudulent trade practices.

## FIFTH CAUSE OF ACTION

## INJUNCTIVE RELIEF

### (Against All Defendants)

53. MedImpact hereby incorporates by this reference Paragraph 1 through 52, inclusive, as if set forth fully herein.

54. Beginning at least as early as November 2007, and continuing to the present time, Defendants wrongfully and unlawfully misappropriated confidential and proprietary information belonging to MedImpact, as described in greater detail herein, and unfairly solicited existing and potential customers of MedImpact.

55. MedImpact has demanded that Defendants stop their wrongful conduct and return MedImpact's confidential and proprietary information. Defendants have refused and continue to refuse to refrain from their misconduct, and prompt judicial action is therefore necessary to protect MedImpact's interest in and control over its intellectual property and to stop Defendants' unfair competition.

56. MedImpact has no adequate remedy at law for the injuries already suffered and likely to be suffered as a result of Defendants' wrongful actions, as it will be impossible for MedImpact to determine the precise amount of damages it will suffer if Defendants' conduct is not restrained. Moreover, if Defendants are not enjoined it will be impossible for MedImpact to maintain control over its intellectual property and to prevent further disclosure of its highly confidential and proprietary information to third parties. Monetary damages will not sufficiently compensate MedImpact for the losses sustained as a result of Defendants' wrongful acts.

///

57. As a proximate result of Defendants' acts as alleged herein, MedImpact has suffered damages, and will continue to suffer damages, unless Defendants are enjoined from using the confidential trade secret information that was misappropriated and ordered to return said information.

## PRAYER FOR RELIEF

WHEREFORE, MedImpact demands judgment against Defendants as follows:

1. For compensatory damages, according to proof, with interest thereon as provided by law;

2. For consequential and actual damages, according to proof, or disgorgement of Defendants' profits unjustly obtained and/or a reasonable royalty, with interest thereon as provided by law;

3. For exemplary damages;

4. For injunctive relief;

6. For its attorneys' fees;

7. For costs of suit as provided for by law; and

8. For such other relief as the Court deems just and proper.

DATED: April 18, 2008            LUCE, FORWARD, HAMILTON & SCRIPPS LLP


By:   s/Andrea M. Kimball
      Andrea M. Kimball
      Michelle A. Herrera
      Attorneys for Plaintiff MedImpact Healthcare Systems, Inc.

## DEMAND FOR JURY TRIAL

Plaintiff MedImpact Healthcare Systems, Inc. hereby demands a trial by jury pursuant to Rule 38 of the Federal Rules of Civil Procedure.

DATED: April 18, 2008    LUCE, FORWARD, HAMILTON & SCRIPPS LLP


By: s/Andrea M. Kimball
Andrea M. Kimball
Michelle A. Herrera
Attorneys for Plaintiff MedImpact Healthcare Systems, Inc.